Bradbury, J.
These two actions were brought in this court by the respective relators, against the superintendent of insurance of this state to compel him to issue to them, respectively, a certificate authorizing each of them to transact the business of life insurance within this state under section 3630<?, Revised Statutes, that prescribes the conditions upon which life insurance companies, organized under the laws of other states, etc., may be permitted to transact the business of life insurance on the assessment plan within this state. The superintendent of insurance, contending that the method of insurance, pursued by these companies, respectively, was not according’ to the assessment plan, declined to issue the certificate demanded of nim.
In respect of the National Life Association of Hartford, Conn., the refusal to grant a certificate rests on the additional ground that it had refused to pay the taxes, which the superintendent of insurance claimed were assessable against it by virtue of section 2745, Revised Statutes. This section of the statute expressly authorizes the superintendent of insurance in ease “such company refuse to pay said tax, after demand therefor has been made” * * * to “ revoke the license of such company to do business in this state.” If, upon this ground, he may revoke a license previously issued, it would seem to, unquestionably, follow that he may also, upon such ground, refuse to issue or renew such license to the defaulting company. An action brought by the superintendent of insurance to recover this tax is pending in the court of common pleas of Franklin county. This effort, however, to recover, according to the ordinary course of justice, through the instrumentality of the *4 courts, the amount claimed to be due from the relator as taxes, does not suspend the power of revocation explicitly given by the section above cited. Even if this power of suspension should be regarded simply as an additional and summary remedy for such default, it ought not, in the absence of a legislative intention to that effect, to be held to require the state, through its officer, to elect between the two remedies. And certainly there' is nothing in the statute or the nature of the proceedings in the courts to recover the amount already payable, to indicate that the legislature intended that the authority thus conferred on the superintendent of insurance should be held in abeyance during the pendency of such action. However, as the taxes claimed to be due from the relator rests on the assumption that it is not engaged in the business of insurance on the assessment plan, the right to revoke its license must stand or fall upon the determination of that question. If it is transacting business on the assessment plan, then the taxes in controversy were not legally assessable against it, and'its refusal to pay them would not justify a revocation of, or refusal to renew, its license.
Both relators are bodies corporate; the first named, The National Life Association, being organized under the laws of the state of Connecticut, the other under the laws of the state of Michigan. An inspection of their respective charters show that their schemes of organization widely differ.
The charter of The National Life Association, is as far as material to the consideration of any matter before the court reads as follows: “Section 2. The capital stock of said corporation shall not be less than one hundred thousand dollars, and *5 may be increased as herein provided, from time to time hereafter, at the pleasure of said corporation, to any further sum not exceeding five hundred thousand dollars; and each share of said capital stock shall be one hundred dollars * * * provided that no stockholder shall be liable to said corporation for any claims against the same, nor shall the stockholders, or any of them, be'liable in any event beyond the amount of their stock owned by them respectively for any losses whatever. ” * * *
Section 3. ‘‘The capital stock of said corporation shall be personal property, and transferable on the books of said association in conformity with its by-laws.”
Section 5. “ * * * The affairs of said corporation shall be managed and conducted by not less than seven nor more than eighteen directors, a majority of whom shall reside in this state, and shall be elected on the second Tuesday in January in each year by the stockholders from among their number. * * * Every officer or director shall be a tona fide stockholder of at least five shares of said capital stock before he shall be qualified to act as such officer or director. ’ ’
Section 6. ‘ ‘ Notice of every stockholders ’ meeting shall be given ten days previous to such meeting in one or more newspapers printed in the city of Hartford. At all such stockholders’ meet ings no business transacted shall be legal unless a majority of the stock is represented. Each stockholder shall be entitled to one vote for each share of stock held by such stockholder.” * * *
These provisions of its charter show conclusively that it is a corporation created for profit; it has a capital stock of one hundred thousand dollars, divided into shares of one hundred dollars *6 each, which capital stock may be increased to five hundred thousand dollars and similarly divided; these shares are declared to be personal property transferable on the books of the “association in conformity with its by-laws the ultimate power to manage its affairs is lodged in its stockholders to the entire exclusion of its policy holders, for the right to attend corporate meetings as well as to elect its officers is vested solely in the former; whatever net profits may accrue from its business will ultimately' go to its stockholders, the policy holders having no interest therein; the rights of the latter being measured by the contract evidenced by their respective policies. It is true that, in an agreed statement of facts submitted to the court, it is stated that: ‘ ‘ The plaintiff pays a dividend of six per cent, per annum on the amount of stock actually paid into its treasury ; the same being paid out of moneys raised and used by it for expense purposes, and the amount thereof being $3,000.00 per annum.” Wedo not see how this bears upon the question of the character or nature of the concern. There is nothing in its charter to prevent the payment of a larger dividend if the earnings of the company at any time would warrant it, or to prevent its setting aside or investing its accumulation in any way it may choose for -the eventual benefit of its stockholders.
Counsel for defendant strenuously contends that a corporation of the character of the relator, that is one possessed of a capital stock and created for the profit of the holder thereof, cannot transact the business of life insurance in Ohio on the assessment plan. This contention, he rests on a fundamental distinction, claimed to exist between the different classes of life insurance *7 companies. The object of one class — that to which the relator belongs — being to make profit for its stockholders, while the other class composed of those doing business on the assessment plan, so-called, is not designed for profit at all, and in fact can have no stockholders among which to divide profits.
Without setting forth our statutes that authorize and regulate the creating of life insurance companies it may be said of them, that while they do not speak to this question with perfect precision, yet as respects Ohio corporations, many of their provisions seem to conflict with the notion that a stock company can do business on the assessment plan. These statutes divide life insurance companies, other than fraternal, into two classes, into one of which it places those companies that have a capital stock, or at least capital, and into the other class such as do not have either capital stock or capital. The general powers of the former class are granted by section 3587, Revised Statutes. The things that may be done by the latter class are set forth in section 3630, Revised Statutes. By the former section (3587) authority is given “to make insurance upon the lives of individuals and every insurance appertaining thereto or connected therewith on the mutual or stock plan, and grant, purchase or dispose of annuities.” By the latter section (3630) “A company or association may be organized to transact. the business of life or accident, or life and accident insurance on the assessment plan, for the purpose of mutual protection and relief of its members and for the payment of stipulated sums of money to the families, heirs, executors, administrators or assigns of the deceased mem *8 bers of such company or association, etc. ’ ’ The power’s of a company belonging to the first class are unlimited as to the individuals it may insure, but are limited to insuring on the “mutual or stock” plan (section 3587, Revised Statutes). A company or association belonging to the second class can only insure the life of a member of the company, and its business must be transacted “on the assessment plan.” As the insured, by the act of insurance under this plan, becomes a member of the insurance company, and as there are no special restrictions respecting the persons who may apply for insurance and consequent membership, except as to the age and health of the applicant, the powers of the two classes in this respect do not greatly differ. But as respects the structure of the companies that compose them, and the method by which they do business, the two classes fundamentally and radically differ. One class has a capital stock or capital and of course stockholders, or members who have contributed to its capital, for whose profit its business is primarily conducted, while the other has neither.
The business of the first class is done none the less for the benefit of its stockholders or members because some of the companies which compose it —perhaps all of them now — with a view to attract patronage uniformly issue policies which stipulate that the holder shall share in the profits of the concern. The companies that compose the first of the classes are empowered to transact business on the mutual or stock plan,0 the other only on the assessment plan. There may be some other minor distinctions between the two classes but these are the chief ones. The two classes together seem to cover the entire field of general *9 life insurance, and we think in respect to Ohio companies, this field was designedly divided by the legislature between these two classes, and that the inference to be drawn from this legislation is that the portion assigned to each was intended for its exclusive occupation. And therefore an Ohio life insurance company, must confine its transactions to such methods of insurance as pertains to the class to which it belongs.
However improbable the supposition may be, that men would invest their money in a concern, the business of which was prohibited by law from returning any profit on the investment, yet there is nothing in the nature of life insurance on the assessment plan to forbid its being transacted by a corporation possessing capital stock and having stockholders or members contributing to its capital by whom its affairs are exclusively controlled. If the general assembly of Ohio in the exercise of its legislative discretion, chooses to vest this power in corporations to be organized with capital stock and stockholders, and men elect to organize such corporations and invest their capital therein, we know of no principle on which the exercise of this power could be prevented by an appeal to the judiciary. It might be claimed with some show of reason, that if the charter óf such a corporation, and the statutes under which it was organized, limited the benefits that might accrue to its stockholders to lawful interest on the amount actually advanced for stock, it ought not to be held a corporation for profit, and that while the stockholders were nominally such, their beneficial relation to the company would rather be that of creditors. However this may be, it is speculative and the subject will be dismissed with the remark that it lies *10 within the province of the legislative and. not of the judicial branch of the government.
Counsel for relator in an interesting discussion of the evolution of life insurance, shows that what is called “old line insurance” has in recent years been materially modified by the applications to its original methods of insurance, some of the principles, and practices that underlie insurance on the assessment plan, and also that within the last decade or two the crudities of the latter plan have been systematized and improved by the adoption of a portion of the features of the former. That the two plans have been steadily drawing* nearer to each other in recent years, that some of their distinctive features have become obliterated is true; and doubtless the causes that have produced that result are still in active operation.
Our statutes do not seem to recognize, to the extent claimed, these evolutions; and notwithstanding what may have been accomplished in this way in sphere of general life insurance, or however near they may have drawn to each other in their methods of transacting business, those statutes quite clearly recognized three distinct methods in which it still may be done; two of these .methods, that upon the stock plan and that upon the mutual plan, aré mentioned in section 3587, Revised Statutes, while reference to the third method; that upon the assessment plan, is found in section 3630, Revised Statutes. We have already seen that life insurance companies created under section 3587, Revised Statutes, and which are required to have capital stock, or fixed capital at least, cannot transact life insurance on the assessment plan; that the reason why they cannot thus transact life insurance is because the *11 general assembly has not granted that authority to them, and is not founded on any incapacity, on account of the mode in which they are organized, to receive and exercise that power. On the contrary that if the general assembly chooses to confer on life insurance companies, organized under section 3587, Revised Statutes, the power to insure lives on the assessment plan, the exercise of such power would be unobjectionable.
The power of a corporation, however, depends on its charter and the laws of the state where it is organized, and although it may be true that our statutes do not authorize stock companies created under them to transact life insurance on the assessment plan, it does not follow that life insurance companies created in other states cannot be clothed with such power by their charters and the laws of the state in which they were organized.
Whatever powers the relator, The National Life Association of Hartford, possesses in this respect is found in section 4 of its charter which is in the following terms:
Section 4. “Said corporation is authorized and empowered to make insurance upon the lives of individuals, and to make contracts upon any and all conditions appertaining to or connected with life risks of whatever kind, or nature, and to grant annuities, and policies may be issued stipulated to be with or without participation in the profits.”
This grant of authority is very broad, and while the object of the concern is doubtless ultimate profit for its stockholders, nevertheless if under the power thus conferred, the relator, without objection from its stockholders, sought to engage in the business of life insurance in this state on what is clearly and unequivocally the assessment plan as *12 that is recognized by the statutes of this state, and complied with the conditions prescribed in section 36306, Revised Statutes, what ground could be assigned as a valid reason for denying’ it admission to transact business under that section?
That the relator, The National Life Association of Hartford, has complied with the formal conditions prescribed by section 36300, Revised Statutes, necessary to entitle it to a license under that section is admitted, and as we have seen, the powers conferred by its charter warrant it to transact life insurance on the assessment plan, the only remaining question is whether the scheme of insurance it pursues, or proposes to pursue within this state is, according to the assessment plan, as that phrase is used in our statutes.
The relator in the course of its business in this state has issued five different forms of policies. They do not materially differ as respects the matter now under consideration. One of them is given.
“The National Life Association of Hartford, Conn. ’ ’ “Amount” “Premium”
U__U_>>
“In consideration of the written and printed application for this policy, and the warranties contained therein, together with the conditions and agreements, on the back hereof, which taken together in their entirety, constitute this contract, and of the payment of the premium of $-at the home office of the Association in Hartford, Connecticut, to be evidenced by the receipt of the association, and a payment of a like sum to be made at said office on or before 12 o’clock noon of the-day of--in every year during the continuance of this contract, this association *13 does hereby insure the life of--of--county of--state of-in the amount of - dollars, (less any indebtedness due the Association by the insured or beneficiary) to be paid at the Home Office within ninety days from receipt of satisfactory evidence at the office of the Association in Hartford, Connecticut, as required by it upon blanks furnished, of a valid claim conditioned upon the death of the insured from any cause assumed under the terms of this contract to-if living; otherwise to the legal heirs or assigns of the insured.”
“In witness whereof” etc.
The “Privileges and agreements” on the back of the policy to which reference is made, so far as material are as follows :
“privileges and agreements.”
' “This policy shall participate in profits as hereinafter provided which shall be apportioned at the expiration of the accumulation period.”
“If living, and all premiums have been duly paid, the insured shall be entitled to select one of the following benefits’
First — To withdraw all surplus standing to its credit (and continue this policy in force for the original amount on payment of stipulated premiums). Either in 1, Cash; 2, Paid up insurance; 3, Annuity.
Second — To surrender this policy for its full value consisting of the entire reserve, together with all surplus accumulations then apportioned by the association. Either in 1, Cash; 2, Paid up insurance; 3, Life Annuity.
The accumulation period under this policy ends on the-day of--, 19 — , at which *14 times the results are estimated at $-in cash, or $ — --in paid up insurance.
Should the insured elect to continue the policy beyond the accumulation period, dividends thereon shall thereafter be apportioned annually, to be used in reduction of premiums.
Provided, that in all of the preceding privileges, the amount therein referred to shall not conflict with the statutory requirements of any state in which the Association is at the, time doing business.
After this policy has been in continuous force three full years, it may be exchanged for anon-participating paid-up-policy, provided written application be made for the same while there is no default in the payment of any premium.
Paid-up insurance will in no case be given for a larger amount than the original policy, unless the insured shall furnish evidence satisfactory to the Association that he is then in an insurable condition. If at any time the proportion of funds credited to this policy (which together with the entire assets, are hereby pledged for its payment) shall not equal the reserve calculated according to the Actuaries Mortality Table with interest at 4 per cent., then this policy may be charged with its share of such deficiency, which, at the option of the Executive Committee, shall be payable in cash, or be charged as interest bearing- premiums. The expense charge on this policy during the first year shall be the installments specified, and thereafter three-fifths of one per cent, annually of its face value and the expenses incurred in protecting and investing the funds of the Association. Premiums are payable annually in advance, but if for convenience of the insured the same are paid semi *15 annually or quarterly, the balance of any annual premium will be deducted in case this policy becomes a claim. ’ ’
An examination of sections 3604 and 3630c, Revised Statutes, before referred to show that, for the purpose of granting certificates of authority to transact the business of life insurance in this state, the general assembly has divided life insurance companies created under the laws of other states into such as insure lives on the assessment plan, and such as do not. And while, as we have seen, supra, the powers of a corporation of this kind, and the scheme of insurance it may pursue, must be ascertained by an inspection of its charter, nevertheless, when it seeks a license to transact business in this state, the question whether that scheme falls within one or the other of those two classes must be determined according to our own laws.
This division of life insurance companies, organized under the laws of other states, made for the purpose of providing for their admission in this state to transact business, distinctly appears for the first time in the statute of April 18, 1883, 80 Ohio Laws, 180. Under that statute life insurance companies created under the laws of other states, that transacted business on the assessment plan, were admitted into this state on terms that were much more liberal than those extended to "such companies as did not pursue that plan. Section 3630c, of the act of 1883, (80 Ohio Laws, 180) above referred to, which prescribed the terms under which life insurance companies of the former class might be admitted into this state,' did not require of them either fixed capital, or a deposit of any sum of money whatever as a condition to their *16 admission, while, by the provisions of sections 3604 and 3605, Revised Statutes, all other life insurance companies organized in other states, as conditions to admission herein were required to possess a prescribed capital, and to deposit with the superintendent of insurance, for the benefit of its policy holders, securities to at least the sum of one hundred thousand dollars. Doubtless the chief consideration that lead to this classification, and consequently to granting to assessment companies admission upon more liberal terms, as to capital than were prescribed in respect of other life insurance companies of other states were; that the former, relying upon past mortem assessments to meet specific losses as they should occur, the possession of a fund accumulated for that purpose would not be necessary to the security of a policy holder, while in respect to the other class those that exacted the payment of a premium in advance, and must rely wholly upon accumulations of capital already made to pay losses, the security of their policy holders demanded that they should possess capital securely invested and exclusively devoted to that object.
Certainly these considerations are sufficient to account for the classifications made, and for the difference in the terms prescribed to the members of each class as conditions for admission to transact business in this state; and one entitled to considerable respect in construing the statute, and, in a doubtful case might be decisive. There is, however, little if any ambiguity in the statute of 1883 (80 Ohio Laws, 180) in this respect.
Section 3630c, Revised Statutes, as then passed clearly made the transaction of business “on the assessment plan ” the test of admissibility under *17 its provisions. If a life insurance company, organized in another state, did. not insure according to that plan, it was not entitled to admission under that section (3630c) but must resort for that purpose to sections 3604 and 3605, Revised Statutes. Manifestly this phrase relates to the method by which the revenue of an insurance company is to be raisbd, or, which is the same thing, to the mode in which the company exacts from its policy holders the consideration to which it is entitled on account of the obligation or risk which it assumes on issuing a policy. In this connection it should be held to mean something specifically different from premium, for it is used in contradistinction to the latter word. Our statutes do not define the word premium, nor do they declare the meaning of the phrase “on the assessment plan.” But the general assembly should be deemed to have used these terms in the sense in which they were understood at the time the statute was enacted. If in the subsequent growth and development of life insurance the different plans on which it is transacted have lost most of their distinctive features, it would not at all affect the construction of the statute. Section 3630c of the statute of 1883 (80 Ohio Laws, 180), however, was amended in 1891 (88 Ohio Laws, 252). The section as then amended is now in force and differs from the section it superseded in a number of quite important provisions. The right to a license under the amended section depends upon specific conditions that the section it superseded did not contain. The fifth of these conditions require of a life insurance company seeking a license under it to show that it “is paying, and for the twelve months next preceding has paid the maximum amount named in its *18 policies or certificates. ” The sixth condition is to the effect that it must show that the “liabilities of the assured or members are not limited to fixed or artificial premiums;” while the seventh condition requires that it shall have accumulated and securely invested a fund “not less in amount than the proceeds of one periodical payment by or assessment on all certificates or policy holders, ’ ’ etc.
The extent to which these conditions impliedly modify the method of raising funds as contemplated by the phrase “on the assessment plan” as originally used, is difficult to determine. The sixth condition by requiring the company to show that it does not rely solely on “fixed or artificial premiums” would indicate that it might raise part of its revenue in that way; the provision of the seventh condition that it shall maintain and invest a fund “not less in amount than the proceeds of one periodical payment by or an assessment on all certificates or policy holders” points in that same direction. These provisions seem to contemplate that a scheme of life insurance, according to which a portion of the fund designed to pay losses may be raised by fixed periodical payments, would not be incompatible with the “assessment plan” of insurance.
However, this may be, as long as the legislature retains this classification of life insurance companies for the purpose of granting to them permission to transact business in this state, the courts must regard it as substantial, and founded on some clearly understood and material features, wherein the two classes differ from each other. The retention of the classification would, otherwise be unaccountable. This difference, we have shown, relates solely to the method in which a *19 company exacts payment from a policy holder for the hazard it assumes by issuing a policy. The one class exacts premiums, or a fixed sum payable periodically in advance without reference to any specific loss, while the distinguishing feature of the other is an assessment of a sum, usually varying in amount, according to the sum to be raised, to be ascertained and levied after the death of the insured. The reason, as we have seen, for this classification and for granting a license toamember of the “ assessment ” class, on more liberal terms than one belonging to the “premium ” class, is that the former class does not necessarily pay its losses from a fund already in existence, but may raise it by a post mortem assessment, while the latter class must resort to a fund, already accumulated, and which, for the security of policy holders, should be safely invested.
The scheme upon which the state exacts taxes from foreign insurance companies, rests also to some extent on this distinction. Section 2745, Revised Statutes.
We think, therefore, that notwithstanding the fifth, sixth and seventh requirements, or conditions found in section 3630c, Revised Statutes, as amended in 1891 (88 Ohio Laws, 252) to bring a life insurance company into the class that transact business “on the assessment ” with the purview of our statutes, its chief source of revenue should be post mortem assessments to pay specific losses.
This view of the matter was, in substance, taken by this court in State ex rel. v. Monitor Fire Association, 42 Ohio St., 555. The court held that: “An annual deposit paid in advance, based on the hazards of the risk, and without reference to an *20 amount necessary to pay losses, that may occur during the year, is in fact a premium paid for carrying the risk and not a specific assessment authorized by the statute.”
The question there related to the transaction of fire insurance, but the reasoning by which this court reached the conclusion announced in that case would 'seem to apply equally to the question of what constitutes insurance on the assessment plan in life insurance. State ex rel. v. The W. U. M. Life Ins. Co., 47 Ohio St., 167; State v. Moore, 38 Ohio St., 7. The policy of the relator which has been recited, shows quite clearly that it exacts of its policy holders fixed sums to be paid in advance at stated periods, and based on the hazard of the risk, and without reference to any specific loss. An ingenious argument based on the “privileges and agreements” set out on the back of the policy, has been presented by counsel for relator. In substance, however, these “privileges and agreements” do not differ from those provisions found in the policies of those companies, whether old line or mutual, which allow the holder to participate in the earnings of the company. Considerable stress was laid by counsel for relator on the proviso, that appears on the back of the policy in connection with the ‘ ‘ privileges and agreements, ’ ’ to the effect “that in all the preceding privileges the amounts therein referred to shall not conflict with the statutory requirements of any state in which the association is at the time doing business.” We know of no statute of this state with which those privileges and agreements conflict. These “privileges and agreements,” however, assist in giving’ character to the plan on which the latter transacts its business. This plan falls within the reason of the *21 statute that requires life insurance companies to deposit securities for the protection of policy holders as a condition to admission to transact business. The reason of that requirement, as' we have shown, rests upon its necessity; it constitutes the chief reliance of policy holders who may reside within the state, without such a deposit the guaranty of ultimate payment would be greatly weakened. The plan also conforms very closely to the letter of sections 3587 to 3609, inclusive, Revised Statutes, its features hear a striking resemblance to life insurance contemplated by those sections, but disclose little if any similarity to that which section 3630c, even since the amendment of 1891 (88 Ohio Laws, 252) describes.
We think the relator is not entitled to a license by virtue of section 3630c, to transact business in this state, but in order to obtain a license for that purpose must comply with sections 3604 and 3605, Revised Statutes.
2. The charter of the other relator, the Home Mutual Life Insurance Company of Detroit, omitting formal provisions immaterial to the questions before the court is as follows :
ARTICLE III.
“Section 1. The object of the incorporation of this company shall be to furnish life insurance to its members, for the benefit of the widows, widowers, heirs and relatives of deceased members and other persons having an insurable interest in the life of such members.
Section 2. There shall be one class or division of members in said company, to be known as the whole life class; the object or purpose of which shall be to furnish life insurance to each member *22 therein by such members paying continuous premiums during life.
ARTICLE IV.
Section 1. Assessments, premiums and payments are to be paid by the members of this company periodically at such stated periods as shall be designated in the member’s policy, according to the following table of rates for each one thousand dollars insurance, based upon the age of each member at last birthday.
Age. Monthly. Bi-monthly. Annual. Quarterly. Semi-annual.
21 $0 90 $1 80 58 $2 70 $5 35 810
22 91 1 82 2 73 541 10 70
23 92 184 2 76 546 10 82
24 94 188 2 82 558 11 05
25 95 190 2 85 5 65 11 17
26 97 194 2 91 5 76 11 41
27 98 196 2 94 5 82 11 52
28 99 1 98 2 97 5 88 11 64
29 1 00 2 00 3 00 5 94 11 76
30 1 01 202 3 03 6 00 11 88
31 1 03 206 3 09 612 12 11
32 1 04 208 3 12 618 12 23
33 1 06 212 3 18 6 30 12 47
34 1 08 216 3 24 6 42 12 70
35 1 10 2 20 3 30 6 53 12 94
36 1 15 2 30 3 45 6 83 13 52
37 1 20 2 40 3 60 7 13 14 11
38 1 25 2 50 3 75 743 14 70
39 1 30 2 60 3 90 7 72 15 29
40 1 35 2 70 4 05 8 02 15 88
41 1 40 2 80 4 20 832 16 46
42 1 45 2 90 4 35 861 17 05
43 1 50 3 00 4 50 8 91 17 64
44 1 55 310 4 65 9 21 18 23
45 1 60 320 4 80 950 18 82
46 1 65 330 4 95 980 19 40
47 1 70 340 5 10 1010 20 00
48 1 80 360 5 40 10 69 21 17
49 1 90 3 80 5 70 11 29 22 34
50 2 00 4 00 6 00 11 88 23 52
51 2 10 420 6 30 12 47 24 70
*23 52 2 25 4 50 6 75 13 37 26 46
53 2 45 4 90 7 35 14 55 28 81
54 2 65 5 30 7 95 15 74 31 16
55 2 85 5 70 8 55 16 93 33 52
56 3 05 6 10 9 15 18 12 35 87
57 3 26 6 52 9 78 19 36 38 34
58 3 47 6 94 10 41 20 61 40 81
59 3 69 7 38 11 07 21 92 43 39
60 3 95 7 90 11 85 23 46 46 16
61 4 18 8 36 12 54 24 83 49 16
62 4 44 8 88 13 32 26 37 52 51
63 4 71 9 42 14 13 27 98 55 39
64 4 99 9 98 14 97 29 64 58 68
65 5 28 10 56 15 84 31 36 62 09
Section 2. Special or extra assessments may be levied by the board of trustees, when it is necessary to meet mortuary losses. All special or extra assessments, or calls for additional premiums shall be apportioned among the members in such manner as to equitably distribute the mortality cost among’such membersinproportion each should have have contributed, since becoming a member, on the basis of the American experience table of mortality, due allowance being given for allprevious payments.
Section 4. The moneys realized from assessments, premiums and payments shall be apportioned to the general fund, mortuary fund, and emergency fund. The object of the general fund shall be to provide for the payment of general or managing expenses of the company. The object of the mortuary fund shall be to provide for the payment of death losses. The object of the emergency fund shall be to provide a trust fund for the payment of death losses or other benefits provided for in the policy of the member, and to protect the company from extra assessments in case of an extraordinary death rate. The emergency fund shall not at any time *24 be less than, the maximum amount at risk on any one life, from and after the date of the incorporation of this company. The Board of Trustees shall apportion the money so realized from assessments, premiums and payments between the several funds named, as it may be deemed best for the interest of the company.”
These provisions of its charter, together with that section of the statutes of Michigan, which prescribes who shall be members of such corporations and their rights as members, show that the relator, the Home Mutual Life Insurance Company has neither capital stock, nor stockholders for whose benefit it was created. Its policy holders are its members, they, alone have a voice in the election of its officers and it is for their benefit, at least in theory, that its business is conducted. Therefore the objection, founded on its internal structure, which was interposed to the claim of the other relator, The National Life Association of Hartford to a license under section 3630c, Revised Statutes, does not apply to the claim of the present relator to a license under that section.
The objection interposed to granting to the present relator a license rests upon its method of transacting business, which, the superintendent of insurance contends is not conducted according to the assessment plan. In order to obtain a correct notion of the scheme of insurance that it pursues, resort must be had to its form of policy which is as follows:
“ In consideration of the payment of the first -premium hereon of--dollars, and of the representations, agreements and warrants made to it by the insured herein named, in his or her application for this policy of insurance, does *25 hereby issue this policy of insurance to--, of--, State of--, and in consideration of the payment in advance thereafter of- premiums of---dollars, this company does promise to pay the sum of--dollars to--the beneficiary herein named, if living at the time of the death of the insured, and if not living, then to the heirs at law of said insured, at the office of said company, in the city of Detroit, Michigan, within ninety days after the acceptance and approval of satisfactory proofs of the death of said insured, provided said death shall occur while this policy is in full force. This policy is issued, delivered and accepted subject to the conditions and agreements contained herein andón the back hereof, which are made a part of this contract as fully as if recited over the signature hereto affixed.”
“In witness whereof,” etc.
The conditions on the back of the policy are in the following terms :
1st. It is expressly agreed that this policy shall not be in force until the same has been delivered to the insured and the first premium thereon shall have been paid in cash during the insured’s lifetime and good health.
2d. When this policy has been in continuous force for three years from its date it shall be incontestable except for the non-payment of premiums when due, for understatement of age or for fraud.
3d. No personal liability is incurred by becoming a member of this company. Payments are optional with the insured, to continue as long as he may desire to keep the policy in force. Payments under this policy during its first two years, after *26 providing for its pro rata of actual death claims occurring upon policies in the first and second policy years, and thereafter quarterly, an amount limited to one-eighth of one per cent, of the face value of this policy may be used for expense purposes, the remainder thereof to be apportioned by the trustees of said company among the mortuary, reserve and emergency funds.
6th. The premiums herein required to be paid by the insured are to provide for the payment of mortuary claims and for the general fund and reserve or emergency funds of this company, and are based upon the adopted tables of rates and graded according to the age of the insured and the amount of insurance named herein, said tables of rates are based upon the American Mortality Tables and the actual experience of American life insurance companies and are deemed adequate to meet all present and future liabilities of the company without necessitating an increase in the ate with advancing age, but as an absolute protection against the possibility of the mortuary or reserve funds becoming depleted, it is agreed that should any emergency arise through epidemic or otherwise, whereby the premiums are insufficient to meet the mortuary requirements, as determined by the board of trustees, additional premiums may be levied to meet such emergency, of which special notice shall be served.
7th. It is expressly understood and agreed by and between the insured and this company that if the insured shall not pay the sum or sums stipulated to be paid in the matter aforesaid, or if any misrepresentations shall have been made or any facts omitted which should have been stated in said application, or if the insured shall violate any *27 of the provisions of this agreement, then this contract shall cease to he binding upon said company, and all payments made shall ,be forfeited to said company.
9th. In case the insured shall fail to pay any premium at the office of the company within the time specified for the payment thereof, a delinquent charge of twenty-five cents will be added. The mem. bership of the insured in this company shall not lapse or determine until ten days after said company shall have mailed to said insured as herein above provided, a notice that said premium has not been paid; and if said insured shall not pay said premium at the office of said company by twelve o’clock noon, on the last day specified in said notice, then the insured’s membership in this company shall lapse and determine; and this policy shall becojne null and void and all payments made thereon shall be forfeited to the company, except when otherwise expressly provided herein.
10th. The application of the insured for this policy of insurance together with the articles of association and by-laws of this company now in force, or which may hereafter be legally adopted, shall constitute a part of this policy.
13th. When the insured shall reach his life expectancy, computed on his age at the date of this policy, he may, by giving the company six months’ notice in writing of his desire to do so, provided the policy is in full force and all payments have been made thereon, discontinue his payments upon the same, and apply his net contribution to the reserve or emergency fund, together with his equitable proportion of all accretions thereto, as determined by the actuary of the company, either to the maintaining of this policy in force, until such credits *28 are exhausted, when it shall cease and determine, or, surrender this policy and withdraw the same in cash, together with any unused dividend accumulations in full settlement of all liability.
14th. Dividends to be declared shall be limited to that part of the reserve fund in excess of $100,-000 and in excess of the amount of one periodical payment from all policy holders.
15th. When the policy has been kept in force continuously for a period often years from its date the insured shall be entitled to participate in whatever dividends may be declared thereafter ; the same to be determined and apportioned by the actuary of the company, and credited on premium accounts to reduce future payments on this policy.
16th. In event the insured shall become totally and permanently physically disabled said company will pay, upon proof satisfactory to the board of trustees upon the receipt and surrender of this policy in full discharge of all claims, the sum of one-half the face value hereof, provided the insured shall so request in writing, while this policy is in full force, subject to the agreements contained herein.”
Does the scheme of insurance thus displayed coincide with that conducted on the assessment plan as that term is used in section 3630c? The obligation of the insured is to pay a fixed sum at stated periods in advance without reference to any particular death claim. Section 6 of the conditions and agreements on the back of the policy shows that the premiums to be paid by the insured, are to provide, indiscriminately for the payment of death claims, to create a general fund, and a reserve (emergency) fund, which latter fund may be in *29 creased, to at least one hundred thousand dollars. The obligation of the policy holder to pay a fixed sum periodically for three distinct purposes is subject to the right of the company to levy “additional premiums” to guard against “the possibility of the mortuary or reserve funds becoming depleted. ” Here there is no obligation or duty laid upon the company to await the exhaustion of these funds or either of them before calling upon the policy holder for additional premiums. These contributions authorized by this emergency clause though denominated “premiums” bear a close resemblance to assessments. The amount of the call is uncertain and depends upon the will of the managing body of the concern, its board of trustees. It is not, however, the chief or usual method of securing an income, and, if the affairs of the company are intelligently and honestly conducted, should never be resorted to except in the event of some widely spread and fatal epidemic. The ordinary, regular and chief source of revenue open to the relator is the fixed periodical payments named in the policy, and in our opinion, for the purpose of admission into the state, they characterize the method of insurance which the company pursues. The possibility that some grave and unforeseen calamity may call into operation, an authority vested in the trustees to call for an additional and uncertain sum, should not be regarded as sufficient to assign the company to that class which transacts the business of insurance on the assessment plan. The general assembly in classifying life insurance companies into those that transact business ontheassessment plan and those that do not, should be taken to have regarded their usual and regular mode of raising *30 revenue rather than the exceptional or occasional methods to which resort may be had upon the happening- of some remote contingency.
We think neither of the relators transact the business of insurance on the assessment plan within the meaning- of section 3630c, Revised Statutes.

Writ refused and petitions dismissed.